# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| ENCO SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-00039-SNLJ |
| | ) | |
| DaVINCIA, LLC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on defendant DaVincia LLC.'s motion to dismiss under 35 U.S.C. § 101 and Rule 12(b)(6). [ECF #18]. For the reasons that follow, DaVincia's motion is **GRANTED** and this case is **DISMISSED with prejudice**.

## I. BACKGROUND

This is a patent infringement action involving two competitors in the manufacture and sale of automated audio-visual ("AV") captioning equipment for television broadcasters and "other forms of transmitted AV signals." Since October 2017, Enco has been the owner of United States Patent No. 7,047,191 (the "191 Patent") entitled "Method and System for Providing Automated Captioning for AV Signals." Enco says DaVincia sells various automated AV captioning systems—including the "ACE 2000," "ACE 2100," and "ACE 2200" (the "Accused Products")—that "practice the claimed invention of the 191 Patent." As such, Enco asserts two counts for direct infringement (Count I) and indirect infringement (Count II) of the 191 Patent.

1

The 191 Patent was issued by the United States Patent and Trademark Office ("USPTO") on May 16, 2006, and is summarized as a "method for providing captioning" using an "AV captioning system." That system is composed of a speech-to-text processor, a signal separation processor, an encoder, a video camera, and a display device. Figure 1 shows a particular configuration of the "video camera [being] operatively coupled to [a] signal processing system, [a] speech-to-text processor system [being] operatively coupled to [the aforementioned] signal separation processing system and to [an] encoder, and [the] encoder [being] operatively coupled to [a] displace device."[1] But, "other configurations for AV captioning system with other components may also be used." In any event, the speech-to-text processor system, signal separation processing system, encoder, video camera, and display device may each take any

---

[1]



FIG. 1

"conventional" form—that is to say, none of these components are uniquely created or improved by the invention, but borrow from existing (and interchangeable) technologies. The 191 Patent suggests, for example, that the speech-to-text processor take the form of a "software application such as [] Dragon Dictate." Whereas, the encoder could be "a Link Electronics PCE-845 Caption Encoder or any other device that can receive and process text data to produce a captioned AV signal." The Display Device, meanwhile, "may comprise … a projection screen, television, or computer display, so long as the particular display is capable of receiving, processing, and displaying an AV signal[.]" One claimed advantage of the 191 Patent, in fact, was to produce captioning data for AV broadcasts "***without the need for any special hardware*** other than what is presently available in the field of captioning equipment." (emphasis added).

In practice, the 191 Patent's method and system is purposed to avoid complications associated with human-transcribed captioning methods. According to the patent, human methods are expensive, time-consuming (particularly in post-broadcast captioning requiring much rewinding), and "prone to error [in live broadcast captioning] since there is a finite amount of time within which to correct mistakes[.]" The 191 Patent's automated system, by contrast, is "able to quickly and inexpensively produce captioning data for AV broadcasts."

The 191 Patent asserts 21 total claims. Of those, Enco says the 191 Patent comprises "three independent claims for a method (claim 1), system (claim 8), and a medium (claim 15) for automatically inserting captions into AV signals, as well as 18 dependent claims." The complaint alleges DaVincia is "directly infringing at least claims

1-14 of the 191 Patent … by using the Accused Products without authority" and is "directly infringing at least claims 15-21 … by making, using, selling, and or offering to sell the Accused Products without authority." It also alleges DaVincia is "inducing infringement … and/or committing contributory infringement … of at least claims 1-6, 8-12, and 14-21 of the 191 Patent." In sum, the complaint alleges DaVincia is directly infringing Patent 191's method and system claims and is indirectly infringing Patent 191's medium claim.

DaVincia moves to dismiss all asserted claims against it under Rule 12(b)(6), arguing the 191 Patent is unpatentable under 35 U.S.C. § 101 as a mere abstract idea.

## II. STANDARD OF REVIEW

The Supreme Court has articulated a two-step framework for assessing patentability under Section 101. *See Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 573 U.S. 208 (2014). First, the court "determine[s] whether the claims at issue are directed to a patent-ineligible concept," such as "[l]aws of nature, natural phenomena, and abstract ideas." *Id.* at 216, 218. If so, the court moves on to determine whether the claim nonetheless contains an "inventive concept" sufficient to "transform the nature of the claim into a patent-eligible application." *Id.* at 217, 221; *see also Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143 (Fed. Cir. 2019). "Whether a claim supplies an inventive concept that renders a claim significantly more than an abstract idea to which it is directed is a question of law that may include underlying factual determinations." *ChargePoint, Inc. v. SemaConnect, Inc.,* 920 F.3d 759, 773 (Fed. Cir. 2019) (internal quotations omitted). Because patents are presumed valid, factual determinations of a

patent's validity or invalidity must be proven by clear and convincing evidence. *Id*.; *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011). "For example, within the overall step two analysis, whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact that must be proven by clear and convincing evidence." *ChargePoint, Inc.*, 920 F.3d at 773.

In this case, DaVincia argues the 191 Patent is an unpatentable abstract idea. The "abstract ideas category embodies the longstanding rule that an idea of itself is not patentable." *Alice Corp.*, 573 U.S. at 218; *see also Gottschalk v. Benson*, 409 U.S. 63, 71 (1972) ("It is conceded that one may not patent an idea."). Said differently, "[a] principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right." *Diamond v. Diehr*, 450 U.S. 175, 185 (1981) (quoting *Le Roy v. Tatham*, 14 L.Ed. 367 (1853)). Thus, as an example, a patent seeking to monopolize a general method for hedging risk in the energy commodities market—reduced to a mathematical formula and adding only "token" inventive contributions—has been deemed too abstract as what is essentially a retelling of "fundamental economic practice[s] … taught in any introductory finance class." *Bilski v. Kappos*, 561 U.S. 593, 611-12 (2010). In a more recent example, the Federal Circuit concluded that a claim which "simply recite[s] a system that wirelessly communicates status information" about a movable barrier, such as a garage door opener, was directed to an abstract idea of communicating information wirelessly and did not contain an inventive concept because the invention used "well understood," off-the-shelf wireless

technology without particular "technological improvement." *Chamberlain Group, Inc. v. Techtronic Industries Co.*, 935 F.3d 1341, 1347-1348 (Fed. Cir. 2019).

**III. ANALYSIS**

    A. ***Alice Corp.*, Step One – Whether the Claims are Directed to Patent-Ineligible Concepts**

The 191 Patent states that it is "a method and system for providing automated captioning for AV [] signals," and that it is a method and system designed to replace human-directed stenography with computer-directed alternatives. The benefit of the 191 Patent, it is explained, is to automate stenography processes with less-fallible computer systems. The question, here, is whether such a method and system falls into the unpatentable category of an abstract idea.

DaVincia relies on *Univ. of Fla. Research Found., Inc. v. General Electric Co.*, which Davincia says is indistinguishable from the case at hand. *See* 916 F.3d 1363 (Fed. Cir. 2019). In that case, a patent known as the "251 Patent" described a method and system for automating the taking of patient bedside physiological data. *Id*. at 1366-1367. The 251 Patent explained how "most health care facilities … acquire bedside patient information using pen and paper methodologies"—that is to say, the collection of data by humans to later be entered into computer information systems—which can be "time consuming and expensive" and result in "transcription errors" in a "fast-paced environment." *Id*. at 1367. To remedy those human deficiencies, the 251 Patent "propose[d] replacing the pen and paper methodologies with data synthesis technology"

6

in the form of "device drivers" written to allow various bedside machines to present data in a "configurable fashion within a signal interface." *Id.*

On the first step of the *Alice Corp.* analysis, the Federal Circuit concluded Patent 251 "is a quintessential 'do it on a computer' patent," effectively proposing—at a broad and overly-generalized level—simply to replace manual collection, analysis, and manipulation of data with computer-driven alternatives. *Id*. Thus, it was "directed to abstract ideas," failing to "specific[ally] improve[] the ways computers operate" or else explain "how the [device] drivers," the only real proposed technological advance, were able to convert machine-specific data into globally usable data by a single graphical interface. *Id*. at 1368. In fact, "[t]he 251 patent fails to provide any technical details for the tangible components[,] instead predominately describing the system and methods in purely functional terms." *Id*. Describing the patent as a method and system of high-level functional ideas, and not discrete patentable technical advancements, the Court went on to remark that many components of the 251 Patent were interchangeable and relied on present art. For example, the component linking bedside machines "employs *any* serial connection that can convey information," and the "programmatic action involving said machine-independent data" can "be performed using *any* kind of computer system or other apparatus, including a general-purpose computing system." *Id*. (emphasis added). Meanwhile, the "bedside graphical user interface" that displays the synthesized bedside machine data was not "limited by [a] particular [graphical user interface] or data entry mechanism." All in all, the 251 Patent was directed merely to the "abstract idea of

7

collecting, analyzing, manipulating, and displaying data" with the replacement of humans by computers. *Id.*

That is also the case here. The 191 Patent takes a collection of "conventional," off-the-shelf computer components—a speech-to-text processor system, signal separation processing system, encoder, video camera, and display device—and proposes to replace humans with the coupled-together result. The patent does not endeavor to improve any particular component, nor does it offer a new intervening component within the larger system or a novel composition of the various components. In fact, like *Univ. of Fla. Research*, the components are interchangeable and the 191 Patent, therefore, suffers from the same high-level generalities and broad-form functional terminology as the unpatentable 251 Patent. As such, the 191 Patent is essentially a "do it on a computer" patent—a patent-ineligible abstract idea.

### A. *Alice Corp.*, Step Two – Whether the Claims Have an Inventive Concept Sufficient to Transform Them into Patent-Eligible Applications

At step two, *Alice Corp.* tells us that a patent may still be saved—notwithstanding that it has been directed to a patent-ineligible concept—if "an element or combination of elements [of each claim]" create an "inventive concept" that transforms the patent, either in "practice" or "application," into something "significantly more than a patent upon the ineligible concept itself." 573 U.S. 217-218. In other words, step two asks whether an inventive concept arises "in one or more of the individual claim limitations or in the ordered combination of the limitations." *BASCOM Global Internet Servs., Inc. v. AT&T Mobility, LLC.*, 827 F.3d 1341, 1349 (Fed. Cir. 2016).

Here, each individual claim limitation relies either on self-described conventional computer components, such as the Dragon Dictate speech-to-text processor and the Link Electronics PCE-845 caption encoder, or else functionally describes potentially inventive improvements like training enhancements (to be applied to the speech-to-text processor) without at all explaining how those enhancements work. That is no concern, Enco says, because "the fact that one or more of the steps in the claimed invention may not, in isolation, be novel … is irrelevant to the question of whether the claims as a whole recite subject-matter eligible for patent protection." Enco points to two flow charts (Figures 2, 5) that it says shows unique combinations of conventional computer components to create what is an inventive concept.

It is true that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Global Internet Servs., Inc.*, 827 F.3d at 1350; *see also Diamond*, 450 U.S. at 188 ("[A] new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made."). This follows from the recognition that "inventions usually rely upon building blocks [of early inventions] long since uncovered." *KSR Int'l Co. v. Teleflex, Inc*., 550 U.S. 398, 401 (2007). However, such a combination or arrangement of conventional pieces must be particularized and concrete in its configuration. "Merely recit[ing] the abstract idea [] along with the requirement to perform it on [] a set of generic computer components do[es] not contain an inventive concept." *University of Fla. Research Found*., 916 F.3d at 1369.

And that is the problem for the 191 Patent at this second step. It is based on interchangeable components *and* interchangeable composition of those components. There is "[no] need for any special hardware," just "conventional" components of any variety sufficient to achieve the stated function, and various "configurations [of the] AV captioning system … [can] be used." In that regard, the patent calls for any "conventional speech-to-text software application," such as "Dragon Dictate," and then refers to various "operation process[es]" those variable applications are expected to do, according to Figure 4 and 5, such as utilizing an "autoflush counter" or "determin[ing] when to send [] text [data] to the encoder." But, nowhere does the 191 Patent suggest its purpose is to specifically improve speech-to-text processing software, and nowhere does it explain how this is to be accomplished—across myriad software iterations—at a technical level.[2] Simply put, there are references to things like "autoflush counters" and computer-determined communication relays between speech-to-text processors and encoders, but nothing at all to explain how those functional operations are implemented at an inventive level. This is insufficient to create an inventive concept that transforms the patent into something more than a patent upon the ineligible concept itself. *See Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161 (Fed. Cir. 2019) (concluding a patent proposing the

---

[2] On this point, Enco takes issue with *ChargePoint, Inc., v. SemaConnect, Inc.*—a Federal Circuit case that found ineligible a patent that claimed to improve electric vehicle charging stations by adding generic networking capabilities. 920 F.3d at 774-775. Enco says *ChargePoint* is "believe to be the only improved machine [case] that the Federal Circuit has found directed to an abstract idea," and points out how it has been "uniformly condemned by the patent bar." (emphasis in original). Be that as it may, *ChargePoint* remains good law and helpfully points to the same concern this Court has for the 191 Patent: namely that an abstract idea cannot be transformed into a patentable one simply by claiming an improvement through the addition of generic equipment. *Id.* (claim did not improve charging stations by merely seeking to "add generic networking capabilities to [them]").

electronic processing of paper checks was directed to an abstract idea where the claims were highly generalized, relied predominately on conventional activities of general-purpose computers, and failed to articulate a specific improvement of the way computers operate); *Elec. Power Group, LLC. v. Alstrom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016) (concluding a method of detecting and analyzing electric power grid events, with no inventive technology used to perform those functions, was an abstract idea urging the use of computer technology generally); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013) (concluding that patent, which implements an abstract concept through the arrangement of generalized software components, without incorporating additional imitations or features, fails to turn the abstract idea into an inventive concept).

## IV. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that defendant DaVincia LLC.'s motion to dismiss under 35 U.S.C. § 101 and Rule 12(b)(6) [ECF #18] is **GRANTED**. This case is **DISMISSED with prejudice**.

So ordered this 20th day of March 2020.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE